UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EDWIN SHERRY and
KIMBERLY SHERRY,

   Plaintiffs,

vs.

COLDWELL BANKER PREFERRED-CANTON,
LILLIAN SANDERSON, KEVIN DEVOY,
KEVIN DOBIS and LISA DOBIS,

   Defendants.
_____/

Civil Action No.
07-CV-13648

HON. BERNARD A. FRIEDMAN

## OPINION AND ORDER GRANTING
## DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

   This matter is presently before the court on (1) the motion of defendants Coldwell Banker Preferred-Canton, Kevin Devoy and Lillian Sanderson ("the Coldwell defendants") for summary judgment [docket entry 20], and (2) the motion of defendants Kevin Dobis and Lisa Dobis ("the Dobises") for summary judgment [docket entry 21]. Plaintiffs have filed a response in opposition. Pursuant to E.D. Mich. LR 7.1(e)(2), the court shall decide these motions without oral argument.

   This is a housing discrimination action. On October 26, 2005, plaintiffs Edwin and Kimberly Sherry made an offer to purchase a house on two acres located at 449 Rachel Marie Drive in Pinckney, Michigan. The house was and still is owned by the Dobises, who had listed the house for sale at $335,000 through defendant Coldwell Banker Preferred – Canton. Defendant Lillian Sanderson is this agency's broker. Defendant Kevin Devoy was the Dobises' Coldwell Banker agent. Plaintiffs offered to purchase the Dobises' house for $325,000. *See* Cmplt. Ex. 1. On

October 29, 2005, the Dobises countered at $330,000. They made the counter-offer contingent on their "ability to successfully obtain a fully executed an[d] accepted purchase agreement and their acceptance of a private home inspection on the home of their choice within 7 days." Cmplt. Ex. 2.[1] Plaintiffs accepted the counter-offer on October 29, 2005. *See* Coldwell dfts' Ex. C.

The Dobises were looking for a house with more acreage and were considering a house on 28 acres in Manchester, Michigan. *See* Dobis dep. at 4, 8-9, 13. On October 30, 2005, they obtained a purchase agreement on the Manchester house, contingent upon a satisfactory home inspection to be performed within seven days. *See* Coldwell dfts' Ex. D. The Dobises retained John Buckwalter of Reliance Home Inspection Services, Inc., to perform the inspection. *See* Dobis dep. at 64. Kevin Dobis accompanied Buckwalter during the inspection, which took place on November 2, 2005. *See id.* at 70; pltfs' Ex. 1. Among other things, the inspector made the following findings:

> While structural components appear to have remained intact since

---

[1]The entire contingency states:

> Offer is contingent upon the following:
>
> 1) Sellers ability to successfully obtain a fully executed an [sic] accepted purchase agreement and their acceptance of a private home inspection on the home of their choice within 7 days. Should seller not fully meet this contingency, at their option seller may declare this offer (Rachel-Marie) null and void. (If sellers are unable to remove this contingency w/in 7 days from acceptance this contract is null and void [illegible] purchased.)
>
> 2) Listing agents approval of buyers preapproval within 3 days. Your office has the pre-approval for buyers.... Faxed 10/28/05.
>
> 3) Offer excludes: flag pole, decorative lightening rods, exterior barn light, chicken coop, swing set, barn gate.

2

> time of construction, some construction defects have resulted in aesthetic issues which cannot be repaired. These defects include basement floor at main area being significantly out of square, which seems to throw the whole house out of square. The best effort at measuring this portion of basement diagonally showed approx. 10" out of square. This problem, by necessity, was transferred to living areas above and while only minimal measuring was done, the family room is significantly out of square with N. wall measuring approx. 4 ½" longer than partition at S. The ends of wood plank flooring at family room E. wall were cut off at another than 90∘ angle to accommodate out of square condition. The basement foundation walls are not plumb, most are 1" - 2" leaning outward, at top. This results in noticeable bowing and out of plumb condition at exterior brickwork which spans the defective foundation walls and changes to more or less plumb at framing walls.
> Line of sight inspection of exterior of N. wall shows poor alignment in spite of wall being "broken up" by cantilevered sections of wall and also wood deck.
> Wood deck is not built at same plane as house wall, partially due to this N. wall alignment problem and partially due to general misalignment of deck to house. (deck boards "run-off" at house wall)
> This is not an exhaustive list of defects, but just a summary of those that seemed more obvious to the "naked eye."
>
> \* \* \*
>
> Wood burner in basement appears to have inadequate clearance between vent pipe and W. wood framed wall. (Faux-stone covering not considered a non-combustible wall) Consult stove-manufacturers installation instructions and repair as nec. for fire-safety!
> Noted that Faux-stone around fireplace comes to lip of firebox, may or may not conform to local codes, for fire-safety!

Pltfs' Ex. 1. Buckwalter also conducted a radon test from November 2 to November 4, 2005, which showed an average radon level of 5.6 pCi/L. *See* Dobis dfts' Ex. 5. The radon report indicated that this level "exceeds 4.0 pCi/L of radon threshold established by the EPA." *Id.*

Shortly after the inspection was completed, the Dobises decided they were not satisfied with the results and would not proceed with the purchase of the Manchester house. *See* Dobis dep. at 86. In particular, they were unhappy about "the unsafe standards of the fireplaces,

3

. . . the basement being ten inches out of square and the high radon" and they "were not interested with the challenges of that home." *Id.* at 83, 15. The Dobises attempted to negotiate a lower price on the Manchester house, but the owners were unreceptive. *See id.* at 16-17, 56. The Dobises called their agent, Kevin Devoy, who called plaintiffs' agent, Victoria Dzendzel-Brown. Kevin Dobis is uncertain as to the date when this occurred, *see* Dobis dep. at 85, but Dzendzel-Brown testified based on an entry in her planner that she received the call from Devoy on November 5, 2005, late in the afternoon. *See* Dzendzel-Brown dep. at 36.

On November 6, 2005, plaintiffs made a second offer on the Dobises' house, this time offering $340,000, $5,000 more than the asking price. *See* Cmplt. Ex. 3; Dobis dep. at 18. The Dobises did not respond specifically to this offer, but they did send a fax to plaintiffs' agent on November 16, 2005, stating: "It is our intent to purchase property for our new home. Once we've found that property, we have every intention of entertaining the last offer your buyer had given to you." Dobises' Mot. for Sum. Jmt. Ex. 3. Plaintiffs sent this letter "[b]ecause we were interested in selling our property if we could find someplace else to move and we wanted to entertain their offer. We wanted to let them know that we were interested in their offer, it was based on us finding something." Dobis dep. at 108. No further negotiations between the parties occurred. Plaintiff have not received any other offers to purchase their house. *See* Dobis dep. at 114. On November 30, 2005, the parties signed a Mutual Release of Purchase Agreement, whereby plaintiffs' $2,000 earnest money deposit was returned to them and the parties mutually released one another from any "claims . . . arising from or by virtue of" the October 29, 2005, purchase agreement. Coldwell dfts' Ex. H.

Plaintiffs initially brought suit on March 21, 2007. On July 2, 2007, the court ordered

4

plaintiffs to show cause why the complaint should not be dismissed, as they had failed to file either a waiver of service or proof of service as to any of the defendants, as required by Fed. R. Civ. P. 4(d)(4) and 4(l)(1). Plaintiffs did not respond to the show cause order, and on July 19, 2007, the court dismissed the complaint. Plaintiffs refiled their complaint, adding defendant Sanderson, the following month.

Plaintiffs allege that the Dobises rejected the home inspection of the Manchester house "in bad faith in order to conceal their discriminatory animus and conduct toward the Buyers and their children" and that "[t]he true reason for the Sellers' decision to terminate the purchase agreement was that they wished to avoid selling the Property to the Buyers because of the size of the Buyers' family and the race and skin color of the Buyers' children." Cmplt. ¶¶ 22, 23. Plaintiffs are Caucasian and have ten adopted children who are "of Asian, Latino and/or African descent." Complaint ¶¶ 8-9, Pltfs' Resp. Br. at 4.

Plaintiffs allege that defendants violated their rights under the Fair Housing Act, 42 U.S.C. §§ 3604(a)-(c) and 3605, by refusing to sell to them "because of the Buyers' familial status and their children's race and skin color." Cmplt. ¶¶ 43-48. Plaintiffs also assert claims under 42 U.S.C. §§ 1981 and 1982 on the same basis. For relief plaintiffs seek damages, an injunction, attorney fees, costs and interest.

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Once a properly supported summary judgment motion has been filed, the burden shifts to the party opposing the motion to "set forth specific facts showing that there

is a genuine issue for trial." Fed. R. Civ. P. 56(e). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* dispute as to any *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Viewing the evidence "in the light most favorable to the opposing party," *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970), summary judgment may be granted only if the evidence is so one-sided that a reasonable fact-finder could not find for the opposing party. *See Anderson*, 477 U.S. at 248-50; *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478-80 (6th Cir. 1989). In other words, "[a] material issue of fact exists where a reasonable jury, viewing the evidence in the light most favorable to the non-moving party, could return a verdict for that party." *Vollrath v. Georgia-Pacific Corp.*, 899 F.2d 533, 534 (6th Cir. 1990).

The provisions of the Fair Housing Act which defendants allegedly violated, 42 U.S.C. §§ 3604 and 3605, state:

> **§ 3604. Discrimination in the sale or rental of housing and other prohibited practices**
>
> . . . it shall be unlawful--
>
> **(a)** To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status,[2] or national origin.
> **(b)** To discriminate against any person in the terms, conditions, or

---

[2]Familial status is defined by 42 U.S.C. § 2602 as follows:

> (k) "Familial status" means one or more individuals (who have not attained the age of 18 years) being domiciled with--
>   (1) a parent or another person having legal custody of such individual or individuals; or
>   (2) the designee of such parent or other person having such custody, with the written permission of such parent or other person.

6

privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin.

**(c)** To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination.

* * *

### § 3605. Discrimination in residential real estate-related transactions

(**a) In general**
It shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin.

**(b) "Residential real estate-related transaction" defined**
As used in this section, the term "residential real estate-related transaction" means any of the following:
(1) The making or purchasing of loans or providing other financial assistance--
(A) for purchasing, constructing, improving, repairing, or maintaining a dwelling; or
(B) secured by residential real estate.
(2) The selling, brokering, or appraising of residential real property.

As noted above, plaintiffs are also suing under 42 U.S.C. §§ 1981 and 1982. Section 1981 provides all persons within the United States equal rights "to make and enforce contracts," while § 1982 provides all United States citizens equal rights "to inherit, purchase, lease, sell, hold, and convey real and personal property."

The applicable legal standards have been articulated by the Sixth Circuit as follows:

7

> The familiar *McDonnell Douglas / Burdine* analysis applies to federal housing-discrimination claims, whether they are brought under the FHA or 42 U.S.C. §§ 1981 or 1982. *Mencer v. Princeton Square Apts.*, 228 F.3d 631 (6th Cir.2000) (applying the *McDonnell Douglas* burden-shifting framework to claims brought under the FHA and §§ 1981 and 1982); *Selden Apts. v. U.S. Dep't of Housing and Urban Dev.*, 785 F.2d 152, 159 (6th Cir.1986) (same). First, a plaintiff who alleges discrimination on the basis of race must make out a prima facie case by showing "(1) that he or she is a member of a racial minority, (2) that he or she applied for and was qualified to rent or purchase certain property or housing, (3) that he or she was rejected, and (4) that the housing or rental property remained available thereafter." *Mencer*, 228 F.3d at 634-35. However, the Supreme Court has instructed that "the precise requirements of a prima facie case can vary depending on the context and were 'never intended to be rigid, mechanized, or ritualistic.' " *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (*quoting Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978)).
>
> If the plaintiff satisfies the prima facie requirements, the burden shifts to the defendant to produce evidence of a legitimate, non-discriminatory reason for rejecting the plaintiff. *Mencer*, 228 F.3d at 634. Finally, the burden shifts back to the plaintiff to show that the defendant's proffered non-discriminatory reason is a pretext. *Id.* "Although the burden of production shifts between the parties, the plaintiff bears the burden of persuasion throughout the process." *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007).

*See also Marbly v. Home Props. of New York*, 205 F. Supp.2d 736, 740 (E.D. Mich. 2002) (noting that "the same analysis applies" to housing discrimination claims brought under 42 U.S.C. §§ 1981, 1982, and 3604(a); "[a]ll turn on the three-part evidentiary standard first developed in the employment discrimination context by *McDonnell Douglas Corp. v. Green*"); *Reeves v. Rose*, 108 F. Supp.2d 720, 725 (E.D. Mich. 2000) (same).

Defendants argue they are entitled to summary judgment essentially for three reasons. First, defendants argue they could not have discriminated against plaintiffs in the manner alleged because they were unaware of the number or race of plaintiffs' children. Second, defendants argue

8

they had a legitimate, non-discriminatory reason for not selling the Pinckney property to plaintiffs – namely, the unsatisfactory inspection of the Manchester house – and that the number and race of plaintiffs' children played no role. Third, defendants argue that plaintiffs' claims are barred by the release. Plaintiffs respond by arguing that the facts are genuinely disputed as to the first two issues and that the release does not extinguish their discrimination claims.

Regarding defendants' first argument, plaintiffs appear to concede that no discrimination could have occurred if defendants were unaware of the number or race of plaintiffs' children, but they believe a jury could find that defendants were aware. Kevin Dobis testified that while he assumed plaintiffs had children because "their realtor talked to our realtor and they talked about the kids, putting bedrooms in the basement or something," he knew nothing else about them. Dobis dep. at 20. Kevin Dobis testified that he has never met plaintiffs and had no knowledge about their family until he was served with the complaint in this case. *See id.* at 11-12. In an attempt to show that he may indeed have been aware, plaintiffs point to the testimony of their agent, Dzendzel-Brown, who says that in late October 2005 she showed the Pinckney property to plaintiffs and that their children came along for the showing. *See* Dzendzel-Brown dep. at 54-55.[3] Although neither the Dobises nor their agent were present during the showing, the Dobises returned by car while the showing was in progress. Dzendzel-Brown noticed their car as it drove by. *See id.* at 56. Kevin Dobis testified that "[w]e came home when there was a showing at our home. I don't know who was, who the potential people were. . . . We came down the road, we seen there was vehicles in the driveway, we went around the cul-de-sac and left." Dobis dep. at 43. Dobis says he saw three adults

---

[3]No deposition testimony from plaintiffs themselves has been submitted by any of the parties. Nor have plaintiffs themselves submitted any affidavits or other statements on these or any other issues in this case.

standing in the driveway, but no children. *See id.* at 44. Significantly, Dzendzel-Brown did not testify that the children were in the driveway area or otherwise visible to the plaintiffs from the road. On this record, no reasonable jury could conclude that the Dobises saw plaintiffs' children on this occasion.

Plaintiffs' only other evidence of defendants' awareness of their children is a comment allegedly made by defendant Sanderson, the broker of the Coldwell agency with which plaintiffs had listed their property. On November 16, 2005, Dzendzel-Brown called Sanderson and asked her

> why Kevin Devoy has not answered the last offer I had put on Rachel Marie. Her first comment she blurted out was you sure write a lot of offers, when are you gonna stop writing offers. And I said excuse me. And, um, she said my client does not have to sell, you can't force him to sell. Maybe your buyers kick holes in walls. She went on and on, repeated herself, you cannot force them to sell.

Dzendzel-Brown dep. at 93-94. Elsewhere Dzendzel-Brown testified that Sanderson said "maybe their children kick holes in walls." *Id.* at 93, 97.

Viewing this statement and Kevin Dobis' deposition testimony in the light most favorable to plaintiffs, a jury could conclude that defendants were aware that plaintiffs had children. However, the record contains no evidence suggesting that Sanderson, Kevin Dobis or any of the other defendants were aware of the children's *race*. In fact, plaintiffs have failed to produce any evidence whatsoever that any of the defendants ever saw plaintiffs' children or that defendants had any awareness, or any possible way of being aware, of their race. Given this complete lack of proof, defendants are entitled to summary judgment on the § 1981 and § 1982 claims as well as on the FHA claim insofar as it is based on an allegation of race discrimination. *See Mitchell v. Shane*, 350 F.3d 39, 49 (2nd Cir. 2003) ("The plaintiff bears the ultimate burden of proving, by a preponderance of

10

the evidence, that the defendants' challenged actions were motivated by discrimination; without some evidence of knowledge of the prospective buyers' racial identity, it is impossible to infer such motivation").

This leaves plaintiffs' claim that defendants discriminated against them based on their familial status, i.e., because they have one or more children. *See* 42 U.S.C. § 3602(k). On this record, no reasonable jury could find in plaintiffs' favor on this claim. The record shows that the Sherrys and the Dobises entered into a purchase agreement on October 29, 2005. That agreement was contingent upon the Dobises obtaining a fully executed purchase agreement, including a satisfactory inspection, on another home within seven days. The record shows that the Dobises were considering only the Manchester property and that they immediately made arrangements for the inspection, which took place on November 2, 2005. As noted above the inspector found significant problems, including the "basement floor at main area being significantly out of square, which seems to throw the whole house out of square"; "the family room is significantly out of square"; "the basement foundation walls are not plumb, most are 1" - 2" leaning outward, at top. This results in noticeable bowing and out of plumb condition at exterior brickwork which spans the defective foundation walls and changes to more or less plumb at framing walls"; "poor alignment" of the exterior north wall; "general misalignment of deck to house"; suspected fire hazards with the wood burner and the fireplace; and an elevated radon reading. The Dobises, not surprisingly, were not satisfied with these inspection results and decided not to go forward with the purchase of that property. This entitled them to void the Pinckney purchase agreement pursuant to the contingency agreed to by the parties.

Plaintiffs argue that a jury should decide whether the Dobises rejected the inspection

11

in good faith or whether, as they contend, this was merely a pretext for discrimination. Plaintiffs have not submitted evidence from which a jury could find in their favor on this issue. They point to the fact that the Dobises attempted to negotiate a lower purchase price on the Manchester property, suggesting perhaps that the Dobises might have been willing to accept the defects for the right price. This does not create a jury-triable issue. Such post-inspection negotiations are common, and the mere fact that the Dobises attempted to engage in such negotiations is not evidence that they actually found the inspection results unobjectionable.

Plaintiffs also suggest that the Dobises did not know the radon test results until after they had already decided not to go forward with the Manchester house, and therefore a jury could find this allegedly unsatisfactory inspection result to be pretextual. The record does not support any such inference. Plaintiffs note that the radon test ran from November 2 to November 4, 2005, and assert that "the Dobis[es] could not have known the outcome of the radon test when they decided on November 3 to pull out of the Bethel Church Road purchase." Pltfs' Resp. at 7-8. In an effort to show that this decision was made on November 3, plaintiffs point to pages 84-85 of Kevin Dobis' deposition testimony. Asked by plaintiffs' attorney *if* the decision was made on November 3, Dobis responded: "I don't know the date, sir. . . . I will not guarantee it was [November 3]. It was within a very timely manner." Dobis dep. at 85. The question by counsel is not evidence, and the response from Dobis was that he did not know the date. In no way does this testimony show that the decision was made on November 3. As noted above plaintiffs' agent, Dzendzel-Brown, testified that she received a telephone call from the Dobises' agent, Kevin Devoy, on November 5, 2005, late in the afternoon – one day *after* the radon test was finished – informing her that the Dobises had rejected the inspection results of the Manchester house. *See* Dzendzel-Brown dep. at 36. On this record, a

12

jury could not conclude that the Dobises "could not have known the outcome of the radon test" when they decided to reject the Manchester house. Accordingly, the timing of the radon test does not support plaintiffs' pretext argument.

The court concludes there are no factual disputes for a jury to decide in this case. The parties had a purchase agreement that was contingent on the sellers "obtain[ing] a fully executed and accepted purchase agreement" on the Manchester house. This contingency was not met because the sellers of the Manchester house would not negotiate with the Dobises following the negative inspection. As there was no "fully executed and accepted purchase agreement" on the Manchester house, the Dobises were within their rights to nullify the purchase agreement on the Pinckney house.

While Kevin Dobis assumed plaintiffs had children, and the court will assume for purposes of this motion that defendants were aware children existed, there is no evidence that they had anything whatsoever to do with the Dobises' decision. Kevin Dobis testified that he and his wife decided not to sell their house solely because "[w]e were not interested with the challenges of [the Manchester] home and we withdrew our offer." Dobis dep. at 15-16, 86. Plaintiffs have offered no evidence to counter this explanation, and no evidence that any of the defendants were even aware of the children's race. There is, in short, no basis upon which a jury could find in plaintiffs' favor on any of their claims.

In light of this complete failure of proof, the court need not decide the effect of the release on plaintiffs' claims. Accordingly,

IT IS ORDERED that defendants' motions for summary judgment are granted.

Dated: August 18, 2008  
      Detroit, Michigan

S/Bernard A. Friedman  
BERNARD A. FRIEDMAN  
CHIEF UNITED STATES DISTRICT JUDGE

I hereby certify that a copy of the foregoing document
was served upon counsel of record by electronic and/or first-class mail.

S/Carol Mullins  
Case Manager to Chief Judge Friedman